**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

KATHLEEN NALLY,

Plaintiff,

    vs.                                   **1:10-CV-1186**

**(MAD/CFH)**

**NEW YORK STATE, NEW YORK STATE**
**DIVISION OF PAROLE,**

Defendants.

_____

**APPEARANCES:**                         **OF COUNSEL:**

SMITH HOKE, PLLC           John J. Hoke, Esq.
18 Corporate Woods Boulevard - Suite 202
Albany, NY 12211
_Attorneys for Plaintiff_

NEW YORK STATE ATTORNEY GENERAL    Richard Lombardo, Esq.
Albany Office                         Assistant Attorney General
The Capitol
Albany, NY 12224
_Attorneys for Defendants_

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Defendants New York State and New York State Division of Parole ("defendants") move

for summary judgment under Rule 56 of the Federal Rules of Civil Procedure in this employment

discrimination action. In the complaint, Kathleen Nally ("plaintiff") sets forth five causes of

action. The first and second causes of action allege that defendants interfered, restrained and

denied plaintiff her rights and retaliated against her in violation of the Family and Medical Leave

Act of 1993, 29 U.S.C. §2617 (hereinafter "FMLA" 29 U.S.C. §2611). The third and fourth

causes of action alleges that defendants sexually discriminated against her and condoned sexual harassment in violation of 42 U.S.C. § 2000e ("Title VII"). The fifth cause of action alleges that defendants retaliated against her for complaining about sexual discrimination and harassment in violation of Title VII.

## BACKGROUND[1]

The facts, unless otherwise noted, are undisputed. From October 2005 to May 2008, plaintiff worked as an Agency Program Aide in the New York State Division of Parole ("Division"), Parole Violation Unit. On May 15, 2008, plaintiff was appointed to a two-year traineeship as an Agency Training and Development Specialist Trainee I in the Division's Staff Development Unit ("SDU"). The SDU was responsible for, among other things, providing continuing training on a variety of subjects for all Division employees. This included professional instruction to parole officers, such as firearms training, as well as general employee development and improvement available to all staff, such as effective writing and the use of computer programs. During plaintiff's traineeship, Joseph Tewksbury ("Tewksbury") was the Director of the SDU and reported to Jose Burgos ("Burgos"), the Divisions Director of Human Resource Management. Roger Hall ("Hall"), an Agency Training and Development Specialist II, was plaintiff's supervisor and reported to Tewksbury. As a trainee, plaintiff's responsibilities included developing and presenting training programs for Division employees.

---

[1] Defendants submitted a Statement of Material Facts pursuant to this Court's Local Rules, in support of their motion for summary judgment. Plaintiff properly responded to the Statement and submitted a Counter-Statement pursuant to this Court's local rules. Therefore, to the extent supported by the record, the background set forth in this section is taken from: (1) defendants' Statement of Material Facts and plaintiff's responses thereto; (2) plaintiff's Statement of Material Facts and defendants' responses thereto; (3) the exhibits and evidence submitted by defendants in support of the motion for summary judgment; and (4) the exhibits and evidence submitted by plaintiff in opposition to defendants' motion for summary judgment. The facts recited are for the relevant time period as referenced in the complaint.

To the extent that emails have been referenced in this section, all emails have been properly authenticated with either deposition testimony or declarations submitted on the within motion.

Defendants allege that in order for the position to become permanent, plaintiff had to satisfactorily complete a two-year period of probation.[2]  The traineeship probationary period provides the employer with the opportunity to evaluate the knowledge, skills, and ability of a candidate for promotion as demonstrated by her conduct and performance.  If the conduct or performance of a probationer is not satisfactory, her employment may be terminated at any time after eight weeks and before completion of the maximum period of probation.  Termination of a probationary appointment does not constitute discipline or punishment.  Upon the termination of a candidate's probationary appointment, she is returned to her previous position with the agency.

At the commencement of plaintiff's traineeship, plaintiff had 139 hours of annual leave, 310.5 hours of sick leave, 29 hours of personal leave and four hours of accrued non-compensated overtime.  Between May 15, 2008 and February 17, 2009, plaintiff requested authorization for 21 full days of paid leave.  Hall and/or Tewksbury approved the absences.

On June 3, 2008, Hall forwarded an email to plaintiff, and others, that was originally from Gregory Sanderl.  Sanderl previously held plaintiff's position in the SDU.  The email contained Sanderl's new phone number and a comment about the "new girl" having small hands.  Plaintiff claims that she did not understand the email and that during a subsequent conversation, Hall intimated that she would need small hands to provide Hall with a "hand job".   At that time, plaintiff, who had been employed for less than one week, did not complain about the email and did not tell Hall that she felt the email was inappropriate.

During her traineeship, plaintiff received four evaluations.  Each evaluation was prepared by Hall and reviewed by Tewksbury and Burgos.  Each evaluation included a determination as to whether plaintiff's probation should be continued or terminated.  On August 18, 2008, Hall

---

[2] Plaintiff disputes this fact and claims that other employees received permanent appointments without completing the two year traineeship.

prepared plaintiff's first evaluation of probationary service. In five of the six categories of performance, Hall noted that plaintiff "meets expectations" and in "relationships with others", he noted that plaintiff "exceeds expectations". Hall recommended that plaintiff's probation be continued. Tewksbury, Burgos and plaintiff signed and approved the evaluation.

During her traineeship, plaintiff sent Hall numerous non-work related emails. On September 12, 2008, plaintiff sent an email to Hall and other co-workers that included the following:

> THINGS THAT ARE DOWN RIGHT IMPOSSIBLE TO SAY WHEN DRUNK:
>
> 1. No thanks, I'm married . . .

On September 19, 2008, plaintiff sent an email to Hall and other co-workers that included the following:

> SEX: Not lately, but I am looking for the right woman (or at least one who will cooperate).
>
> DO YOU HAVE ANY SPECIAL SKILLS?: Yes, but they're better suited to a more intimate environment . . .
>
> WHAT WOULD YOU LIKE TO BE DOING IN FIVE YEARS?: Living in the Bahamas with a fabulously wealthy dumb sexy blonde supermodel who thinks I'm the greatest thing since sliced bread. Actually, I'd like to be doing that now . . .

During the course of plaintiff's traineeship, Hall referred to plaintiff as "Vanna White".[3] Hall also frequently greeted plaintiff and other female employees in the SDU saying "Good Morning, Gorgeous". Plaintiff did not tell Hall that she believed that comment was inappropriate.[4] Hall frequently gave gifts to the SDU staff on holidays and birthdays. On

---

[3] The parties dispute the facts surrounding plaintiff's complaints about these comments.

[4] The exact dates of these comments are not contained in the record.

plaintiff's birthday, Hall gave plaintiff a cosmetic gift pack containing soap, perfume and bath lotion. Hall gave similar gifts to other female staff members. Plaintiff unwrapped the gift and thanked Hall. Plaintiff did not tell Hall that she felt the gift was inappropriate and made no complaints to the Division regarding the gift.[5]

On September 29, 2008, plaintiff requested a change in her work schedule from 8:30 a.m. to 4:30 p.m. to 8:00 a.m. to 4:00 p.m. Tewksbury approved that request.

In the Fall of 2008, while Hall was teaching a computer class, he told a joke about a dyslexic genie who mistakenly grants a wish for a "ten inch pianist". Earline Corbitt ("Corbitt"), Director of the Division's Office of Equal Employment Opportunity/Diversity Management, was in attendance. Corbitt told Hall not to tell the joke again during any future training classes.

On November 7, 2008, Hall sent an email to plaintiff confirming that she and a female co-worker would be traveling to Peekskill and stated, "I just do not want to see any 'wild women in the Peekskill videos. Or, again, maybe I do!' ". At that time, plaintiff did not complain to Hall about the email.

On November 14, 2008, Hall prepared plaintiff's second evaluation. In four of the six categories of work performance, Hall noted that plaintiff "meets expectations" and in the category of "personal work" and "communications", he noted that plaintiff "exceeds expectations". Under communications, Hall noted, "Kathy communicates well with coworkers, supervisors and customers". Hall noted that plaintiff, "at times seems reticent to deal with unusual situations as they arise". These comments were in reference to, among other things, an incident that occurred when Hall asked plaintiff to teach a class and she declined. Tewksbury, Burgos and plaintiff signed and approved the evaluation.

---

[5] The record does not contain any date or time frame with respect to this incident.

On February 17, 2009, plaintiff was confronted with a medical emergency involving her husband. Plaintiff, who was scheduled to teach a class with Hall on February 18, 2009, telephoned Hall to tell him what had transpired. Hall told plaintiff to take off as much time as she needed. On February 18, 2009, Hall sent a confidential email to Tewksbury advising that plaintiff was out of the office due to a family emergency. On February 18, 19 and 20, 2009, plaintiff called in sick and was advised by Hall to take as much time as she needed.

On February 23, 2009, at 8:35 a.m., plaintiff sent an email to Mary Leonard ("Leonard"), the Division's Associate Personnel Administrator and asked, "[c]an I use Sick Leave (FMLA) for [family member's] illness?" At 8:38 a.m., Leonard responded stating:

> You can charge your sick leave and indicate in the remarks section "family". You still have to charge the accruals to your sick leave. FMLA is something else altogether . . . it is meant for a serious health condition for a member of your family or yourself and requires medical documentation.

At 8:45 a.m., plaintiff responded to Leonard, "[w]hat is the advantage/disadvantage to using FMLA?" At 8:53 a.m., Leonard responded:

> You have to provide medical documentation indicating that a family member or yourself has a serious medical condition and that your services are required to care for them. You would still have to charge your accruals OR you could go on leave without pay. If you go on leave without pay, your health benefits would be kept up and you would only be required to pay for the employee portion, which is the portion that is deducted out of your paycheck now. You are entitled to 12 weeks in a calendar year.

Leonard attached a PDF document entitled "Employee Rights and Responsibilities under FMLA".

At 8:54 a.m., plaintiff responded:

> Oh thanks Mary. I will just keep it the way I am doing it.

On February 23, 2009, with Hall's approval, plaintiff left work at 12:45 p.m. On February 24 and 25, 2009, plaintiff was absent from work, with Hall's approval. Between March 5, 2009 and March 27, 2009, plaintiff requested authorization for four full days of paid leave and two partial days of paid leave. Hall approved these absences.

On March 18, 2009, at plaintiff's request, plaintiff met with Corbitt to obtain Corbitt's opinion on some issues and asked Corbitt to keep the conversation confidential.[6]

On April 1, 2009, Hall reviewed plaintiff's time sheets and determined that, since the commencement of her probation, plaintiff had incurred a total of 39 (7.5 hour days) of absences. On April 1, 2009, Hall had a conversation with plaintiff and told plaintiff that she could take as much time as she needed however, he advised her that if she exceeded 40 absences during her two-year probationary period, the number of absences exceeding 40 could be added to her probationary period.[7] Later that day, Hall and Tewksbury met with plaintiff. Plaintiff was upset and felt that she was being punished for taking time off that both Hall and Tewksbury had previously approved. During the conversation, plaintiff stated that she felt she was being treated

---

[6] There is a factual dispute with regard to the sum and substance of the meeting. That dispute is discussed *infra*.

[7] 4 NYCRR 4.5(g) provides:

> Absence during probationary term. Any periods of authorized or unauthorized absence aggregating up to 10 workdays during the probationary term, or aggregating up to 20 workdays if the probationary term or maximum term exceeds 26 weeks, may, in the discretion of the appointing authority, be considered as time served in the probationary term. When the probationary term for a trainee appointment of trainee promotion exceeds one year, any periods of authorized or unauthorized absence in such probationary term aggregating up to 20 workdays multiplied by the number of years, including a fraction of a year, constituting the probationary term, may in the discretion of the appointing authority, be considered as time served in the probationary term. Any such periods of absence not so considered by the appointing authority as time served in the probationary term, and any periods of absence in excess of periods considered by the appointing authority as time served in the probationary term pursuant to this subdivision, shall not be counted as time served in the probationary term. The minimum and maximum periods of the probationary term of any employee shall be extended by the number of workdays of his absence which, pursuant to this subdivision, are not counted as time served in the probationary term.

unfairly and that the Civil Service rule did not apply to her position since she had been promoted to a new position and was not a new hire. Tewksbury told plaintiff he would consult with human resources regarding her situation. Tewksbury and Hall acknowledged that plaintiff's time off requests were not inappropriate and told her that she was not being punished but that they were providing her with information concerning the Civil Service rule regarding the extension of her probation.

On April 1, 2009, plaintiff sent an e-mail to Leonard and asked, "[i]f I miss over 20 days this year, do they have to extend my probation?" On April 1, 2009, plaintiff met with Leonard and told her that she was upset that she was not previously informed of the rule but conceded that she would have taken the same amount of time off even if apprised due to the medical emergency that arose with her family member.

On April 2, 2009 at 8:53 a.m., plaintiff sent the following email to Hall:

> As a follow up to our meeting yesterday, regarding my time off, I am submitting to you a Voluntary Reduction in Work Schedule (VRWS) request. I am requesting to drop a 90% [sic] schedule as soon as possible for personal reasons. I would appreciate every other Friday, as it won't interfere with any roll out training that I may be called upon to go to. This way I can maintain and support in my [family member's] recovery without my Probation being further extended.
>
> My request is to start on April 24th, if possible. At this time, I would like to submit this request for three months, and at that time, I will keep you informed whether or not I need to extend it, or not.
>
> Please keep me informed of the process. I will be handing you the application this morning.

On the same day, plaintiff submitted an application for VRWS in which she requested every other Friday starting April 17, 2009.

On the same day, at 11:29 a.m., plaintiff sent an email to Leonard stating that, "Joe said if I miss any more time my probation will be extended for sure". Plaintiff stated that she had

appointments scheduled that "Roger" knew about and told Leonard, "I am in a bind because there is no way, unless I ignore [my husband's] needs and my own health issues, that I can avoid taking some time in the next couple of months". Plaintiff advised that she requested VRWS because, "I thought it would be the most effective way so I don't use any other time".

At 11:50 a.m., Leonard responded:

> In my opinion, the fact that they may or may not extend your probation is really of no consequence. I know it seems unfair to you and that you feel that you were mislead and given a false sense of security, but try not to let it consume you because you have more important issues to worry about now. Yesterday you said you would have taken the time off regardless of whether or not they made those statements and you were right. If they extend your probation by the amount of absences, it will not make much of a difference in the long run . . . I think your suggestion that you participate in VRWS is a good compromise.

Plaintiff responded, "[t]hanks Mary. You are a sweet, real person."

On April 2, 2009, Hall and Tewksbury approved plaintiff's VRWS request. In accordance with plaintiff's VRWS, plaintiff was not scheduled to work on April 17, May 1, May 15, May 29 and June 12, 2009. These days were not counted towards the total number of absences during plaintiff's probationary period.

On April 3, 2009, Leonard approved plaintiff's VRWS application. In response to plaintiff's request, Leonard provided plaintiff with a second copy of the "Employee Rights and Responsibilities Under the Family and Medical Leave Act" and the Department of labor's Family and Medical Leave Act Advisor, which contains frequently asked questions about FMLA. Both documents were previously provided to plaintiff in February 2009. Leonard also provided plaintiff with a "Certification of Health Care Provider for Family Member's Serious Health Condition (Family and Medical Leave Act).

On April 3, 2009, Tewksbury sent a memorandum to plaintiff, with a copy to Hall and Burgos, entitled "Probation Time and Attendance". In the memorandum, Tewksbury memorialized his April 1, 2009 meeting and conversation with plaintiff and Hall. Tewksbury also advised plaintiff the her request for VRWS was approved and that any time that plaintiff took off as part of VRWS would not cause an extension in her probation. Tewksbury advised plaintiff that Hall's interpretation of the Civil Service rule was correct and that plaintiff's probation could be extended by any number of days missed in excess of over 40 days, aside from her VRWS leave. Tewksbury further expressed concerns regarding plaintiff's allegations that she was being treated unfairly or punished. Tewksbury indicated that both he and Hall had attempted to accommodate plaintiff's needs and consistently approved her leave requests citing the change in her daily work schedule and her VRWS leave request. Tewksbury reiterated that if plaintiff's probation was extended, it would be in accordance with the Civil Service rule and not for disciplinary purposes. Tewksbury directed plaintiff to bring any further concerns to Hall in a "controlled and professional" manner and also stated that he was available to meet with plaintiff as needed.

On April 3, 2009, plaintiff sent an email to Tewksbury with a copy to Burgos and Hall, acknowledging receipt of the memorandum and stating:

> I just want to say thank you for approving my VRWS application.
>
> Ms. Leonard just called me and told me it has been approved. Apparently on the application I wrote the start date of 4/17 and it was signed off on. In my email request to Roger I put the 24th for a start date.
>
> So, I clarified the start date with Roger and he approved it for the 17th. I called Ms. Leonard back with confirmation of 4/17.

After receiving the email, Tewksbury and plaintiff had a conversation. Plaintiff expressed her appreciation for the VRWS leave and Tewksbury advised plaintiff to submit documentation

regarding the requirements of her family member's treatment to the Human Resources department. This conversation was documented in an email from Tewksbury to Burgos.

Between April 1, 2009 and June 24, 2009, plaintiff's husband was not hospitalized and was working and able to drive himself. During this time, plaintiff took off every other Friday, without pay, and requested an additional four full days of paid leave and ten partial days of paid leave. All absences were authorized by Hall. On June 8, 2009, plaintiff submitted a request for an extension of her VRWS. On June 17, 2009, Burgos approved the request.

On April 21, 2009, Hall showed plaintiff, and others, a course manual that Hall had prepared for an effective writing class that he was scheduled to teach on April 22, 2009. The manual contained three sentences, designed to show how incorrect grammar or punctuation can alter the meaning of a sentence. The first sentence read, "[a] woman, without her, man is incomplete". The second sentence read, "[a] set of mixing bowls was designed for the serious cook with round bottoms for effective beatings". The third sentence read, "[t]his desk is suitable for a secretary with large drawers and thick legs".

Plaintiff believed the sentences were inappropriate. Based upon her concerns, Hall removed the first sentence. The matter was brought to Tewksbury's attention.[8] At his suggestion, Hall spoke with Corbitt and Dawn Lewandowksi, Division's Office of Equal Employment Opportunity/Diversity Management (Affirmative Action). Hall was advised that the second sentence should be removed but that the third sentence was acceptable. Hall acted accordingly.

During the April 22, 2009 writing class, Hall told a joke that, he admits, was in poor taste. Hall joked that he was so ugly that when he went to the proctologist, the doctor stuck his finger in Hall's mouth.

---

[8] It is unclear who brought the matter to Tewksbury's attention.

On April 23, 2009, at 10:50 a.m., plaintiff sent an email to Hall in which plaintiff stated:

> I would like to mention to you that there were some not so positive remarks yesterday about one or more of the jokes you told during the effective writing class. I also thought one of them especially, was very crude and offensive. I was very embarrassed by it.
>
> In the past, Earline Corbitt was in a computer class with us and you told a very distasteful joke. She told you never to tell it again. I have never heard you repeat that joke, but you do come up with others that are very offensive.
>
> Also, Amanda and I have been reviewing the booklet with you. Several weeks ago, we told you that #9, page 40, "This desk is suitable for a secretary with large drawers and thick legs" was not suitable, or could be offensive. You said you were going to remove it from the book. I was shocked yesterday that you had left it in the book and the power-point presentation.
>
> I am mentioning this because I participate in these classes with you as part of my traineeship. I don't want my job in jeopardy because of the jokes, or certain items in the manual, that I believe are inappropriate.

On April 23, 2009, at 11:01 a.m., Hall sent an email to plaintiff, with a blind copy to

Tewksbury, stating:

> I appreciate your comments and concerns.
>
> I do apologize to you if you felt the joke was inappropriate. I can see how it may have been taken that way[.] It was not my intention to offend anyone. If you care to tell me who complained, I will offer my apologies to them directly.
>
> As far as the example used in class, I did confer with Earline and Dawn, and they both agreed that it was appropriate. Therefore, I left it in.

Hall testified that he spoke with Tewksbury regarding the incident:

> A.     Basically I explained to him that off the top of my head I had used a joke that perhaps in retrospect I realized as soon as it was out that it was probably in poor taste. So we discussed that I needed to be more aware, especially as a supervisor of my role in the unit and I should be more careful with some of my references.

12

On April 27, 2009, Hall prepared plaintiff's third evaluation of probationary service. Hall noted that plaintiff's performance meets expectations and recommended that plaintiff's probation be continued. Under "personal work", Hall noted that plaintiff "meets expectations" and stated:

> As a member of the Staff Development Unit, Kathleen has established generally acceptable working relationships with other staff members. Kathy's working relationship with her supervisor has recently become strained. She prefers to communicate via email rather than face-to-face discussions.

Under "Attendance", Hall noted that plaintiff met expectations:

> Kathy adheres to the Division's Time and Attendance rules. Kathy has been advised that her probationary period may be extended if she exceeds the 20-day per year limit on traineeships. At this point, she has charged a cumulative total of 40 days. As a point of note, much of the time charged was necessitated by extraordinary circumstances and ws not considered to be inappropriate.

Under "Additional Comments", Hall noted that, "[i]n order to mitigate further charges, she has requested and received approval to participate in the VRWS program".

Hall recommended that plaintiff's probation be continued and Burgos and Tewksbury approved the recommendation. Tewksbury noted:

> You have done a lot of things well. But your relationship with [Hall] does cause me concern. You should work to improve it. I am available to assist.

On April 29, 2009, plaintiff reviewed her third evaluation of probationary services and prepared "comments". Plaintiff included the following observation:

> Regarding another comment Roger made in my evaluation, that "I prefer communicating via email" I believe that is in retaliation to an email I did send him on April 23, 2009. It was regarding an inappropriate joke he told in a class he taught the previous day. I felt the need to tell him that several participants, including myself, were extremely offended. I know at least one other person also emailed him regarding this. I feel if I am being mentored by someone who is telling distasteful jokes that is a negative reflection on me as well as Staff Development. Also, he has done it in previous classes, and was

told once before by Earline Corbitt (who was a participant in that class) to never say a joke like that again.

Plaintiff executed her evaluation and her probation was continued.

On June 10, 2009, at 8:06 a.m., plaintiff sent an email to Hall indicating that she would like to leave at noon "if possible". Upon receipt of the request, Hall went to plaintiff's desk and indicated that the office was short-staffed and asked whether plaintiff really needed to take the time off. In response, plaintiff stated that if she did not need the time off, she would not have asked for it and that there was an illness in her family. Hall then advised plaintiff that he would approve the request and sent a confirming email at 9:12 a.m. A few minutes later, plaintiff went over to Hall's desk and asked about the status of her request to take one week off in August. In response, Hall advised plaintiff that Tewksbury had final approval on leave requests for the summer and that Hall had not received Tewksbury's decision on the request. Plaintiff responded, "I need to know. We put a deposit down on a place in New Jersey". Plaintiff and Hall discussed the matter further:

> A. I asked him why I never heard back about my vacation time, whether it was approved or not approved when everyone else's was approved in the time off the book [sic]. And, he told me that it's up to Joe.

> Q. Did you say you were being treated unfairly?

> A. Yes. I thought they were treating me unfairly.

> Q. And, did you say that?

> A. Yes.

On June 10, 2009, Hall sent a memorandum to plaintiff, with a copy to Tewksbury, that stated:

> On June 10, 2009, I received the following email from you: "I would like to leave at 12:00 p.m. today if possible".

14

Since your request did not convey a sense of urgency and we were short on office coverage, I asked you if you needed the afternoon off. Your response was a curt, "If I didn't need it, I wouldn't have asked for it!" You then stated there was an illness in your family; I approved your request.

A short time later, you came to my desk and inquired about your annual leave request for August 24 through 28. I replied that I had forwarded it to Joe who would review and make final approval for all leave requests for the summer. That response was not acceptable to you. You said that when you made your request there was no one else in the book (except Adrian) and now everyone was in the book for that week off. You went on to say that you could not wait for an answer, that you had rented a house, and that you would take the time off anyway.

You then continued to say it was unfair of me to ask you if you needed the afternoon and that I was treating you differently than the others in the office. You mentioned that I give preferential treatment to Amanda because she sat down and talked to me about needing the afternoon for her sick child.

I asked that we take the discussion into the training room because you were getting animated and loud. I felt it was becoming inappropriate to continue the discussion in the open office.

I explained to you that I asked you about the afternoon only because of the lack of urgency in your email and that I was concerned about office coverage. I also pointed out that I have never denied any of your requests for leave.

Your tact was to keep focusing on how you were being treated unfairly. Your voice was rising and your tone was becoming disrespectful. When I asked if I had said it was not possible to take the afternoon off your reply was, "I would have taken it anyway". I considered your tone and demeanor not only disrespectful to me but also insubordinate.

Kathy, I have always accommodated your requests for time and feel that your behavior and comments today were completely unwarranted and inappropriate.[9]

---

[9] Plaintiff denies the accuracy of the representations in the memorandum.

On June 11, 2009, Hall told Tewksbury what had transpired on June 10, 2009 and provided him with a copy of the June 10, 2009 memorandum. On June 11, 2009, plaintiff met with Tewksbury and Hall in Tewksbury's office. After discussing what occurred on June 10, 2009, Tewksbury advised plaintiff that he was recommending that plaintiff's probation be terminated. On June 11, 2009, Hall and Tewksbury met with Burgos and reported to him what occurred on June 10th and 11th.

On June 15, 2009, Hall prepared plaintiff's final evaluation of probationary service and noted that plaintiff's performance was unsatisfactory and recommended that plaintiff's probation be terminated and that she be returned to her previous title. Plaintiff received unsatisfactory ratings for "personal work" , "attendance" and "communications". Under "personal work", Hall noted:

> Ms. Nally's relationships with SDU's clients are generally satisfactory. However, as she alleges she is being treated differently than other members of Staff Development, her relationships with co-workers are strained. She has commented that there is a conspiracy with the office support staff and that they are running the unit. The relationship with her supervisor is difficult and at times, discourteous.

Under "Attendance", Hall noted, "Kathleen has exceeded the 40 day (20 days per year) limit imposed by Civil Service on two-year traineeships". Under "Additional Comments", Hall recounted the events that transpired on June 10, 2009.

On June 15, 2009, Tewksbury and Burgos approved plaintiff's final evaluation. On the same day, plaintiff signed her final probationary evaluation. After receipt of her evaluation, plaintiff met with Burgos, at plaintiff's request. Plaintiff asked to be assigned to the Clemency Bureau and to continued her VRWS. Burgos said that he would approve plaintiff's continued VRWS and do whatever he could to ensure that plaintiff was assigned to the Clemency Bureau. At that time, plaintiff stated that her final evaluation of probationary service was "bullshit".

Plaintiff also stated that Hall made inappropriate jokes during an effective writing class and that she believed that the final evaluation was in retaliation for plaintiff having sent an email to Hall on April 23, 2009 about his allegedly inappropriate jokes.

On June 15, 2009, Burgos and Tewksbury spoke with Hall about inappropriate comments. Burgos instructed Tewksbury to issue a counseling memorandum to Hall advising him to refrain from making any remarks in the workplace that could be interpreted as offensive. On June 16, 2009, Tewksbury issued a memorandum.

On June 17, 2009, Burgos advised plaintiff, via letter, that her traineeship in the SDU would be terminated on June 24, 2009 and that, on June 25, 2009, plaintiff would return to her previous position as an Agency Program Aide in the Clemency Unit. Burgos also confirmed that he approved an extension of plaintiff's VRWS.

## DISCUSSION

### I. Summary Judgment Standard

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56©, (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## II.     FMLA Interference

In the first cause of action, plaintiff alleges that defendants denied plaintiff her rights under 29 U.S.C. §2611, more specifically, defendants interfered with her right to utilize FMLA qualified leave and terminated her as a result of the use of said leave.[10] Defendants move for summary judgment and dismissal of this cause of action arguing that plaintiff failed to provide notice of her intention to take leave. Moreover, defendants claim that plaintiff cannot demonstrate that she was denied benefits, to which she was entitled, under FMLA.

The FMLA entitles covered employees to take up to 12 weeks of leave per year to care for a spouse, parent, or child that has a serious health condition, or for the employee's own serious health condition that makes the employee unable to perform the functions of his or her position. 29 U.S.C. §§ 2612(a)(1)(C),(a)(1)(D),(b). "The term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital,

---

[10] Plaintiff's allegations regarding termination and FMLA retaliation are discussed *infra*.

hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A)(B).

"Section 2615(a)(1) of the FMLA states that '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter' ". *Potenza v. City of New York,* 365 F.3d 165, 167 (2d Cir. 2004) (citing 29 U.S.C. § 2615(a)(1)). An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA." *Nichik v. New York City Transit Auth.,* 2013 WL 142372, at *12 -13 (E.D.N.Y. 2013) (citing *Sista v. CDC Ixis N. Am., Inc*., 445 F.3d 161, 176 (2d Cir. 2006)). To state a *prima facie* claim for interference under the FMLA, the plaintiff must allege: (1) he is an eligible employee; (2) the defendant qualifies as an employer under the FMLA; (3) the plaintiff was entitled to take leave under the FMLA; (4) the plaintiff gave notice to the defendant of his intention to take leave; and (5) the defendant denied the plaintiff benefits to which he was entitled under the FMLA. *See Brown v. Pension Bds*., 488 F.Supp.2d 395, 408 (S.D.N.Y. 2007).

A.    **Entitled to Take Leave**

The parties have confined their arguments to the issue of notice while presupposing that plaintiff was entitled to take FMLA leave. The record does not clearly establish this fact. Therefore, the Court is compelled to begin its analysis with this issue. Under the FMLA, "[c]ontinuing treatment is defined as 'incapacity of more than three consecutive calendar days' with 'subsequent treatment or further incapacity relating to the same condition' ". *Caldwell v. Holland of Tex., Inc*., 208 F.3d 671, 674 (8th Cir. 2000) (citing 29 C.F.R. § 825.114(a)(2)(i)). "The rules define 'incapacity' as 'inability to work, attend school or perform other regular daily

activities due to the serious health condition, treatment therefor, or recovery therefrom' ".

*Brehmer v. Xcel Energy, Inc.*, 2008 WL 3166265, at *8 (D.Minn. 2008) (citing 29 C.F.R. §

825.114(a)(2)(i)). "Generally, a plaintiff's own statement is insufficient to establish incapacity

under the FMLA." *Id.* (citations omitted). "If an employee has satisfied the work-hour

requirement, an employer may require the employee to submit a certification issued by the

patient's health care provider in order to evaluate the leave request." *Porter v. Potter*, 2010 WL

9047894, at *5 (E.D.N.Y. 2010) (citing 29 U.S.C. § 2613(a)) (the defendant correctly argued that

the plaintiff was ineligible for the FMLA leave he requested on July 29, 2006, due to his failure to

provide a complete and sufficient certification); *see also Robertson v. Amtrak/Nat'l R.R.

Passenger Corp.*, 400 F.Supp.2d 612, 626–627 (S.D.N.Y. 2005) (explaining that even if an

employee has fulfilled the notice requirements for FMLA leave, an employer is still permitted to

request medical documentation to support the leave request).

It is undisputed that, in February 2009, Leonard advised plaintiff that she would "have to

provide medical documentation indicating that a family member or [herself] has a serious medical

condition and that your services are required to care for them".   During plaintiff's deposition, she

authenticated her February 2009 email exchange with Leonard and testified about her response,

"Oh thanks Mary, I will just keep it the way I am doing it":

> Q.    Was that to say that rather than requesting family leave, you
>        were going to continue to use your time?
>
> A.    Well, personally, when I saw this, that you need medical
>        documentation, it scared me a little, because this was my
>        husband's business; no one else's business, so - - and at this
>        point in time, not even a week after it happened, this wasn't
>        the major thing on my mind.  So no, I didn't even look into it
>        or read into it properly.

Plaintiff testified that "it" meant that she would "continue to charge [her] time on [her] time sheet". *See* Pltf. Dep. at p. 83-84.

In April 2009, Leonard provided plaintiff with a Certification of Health Care Provider for Family Member's Serious Health Condition (FMLA).  Further, plaintiff admits that on April 30, 2009, Tewksbury advised her to submit a doctor's note to Human Resources documenting her husband's treatment.  Plaintiff admitted in her deposition that she did not provide any medical documentation concerning her husband's condition. *Id*. at p. 86, 88.  The record does not contain any medical evidence regarding plaintiff's husband's condition, including his diagnosis, the severity of his condition, the type of treatment he received or the duration of the treatment. Plaintiff's husband was released from the hospital after one month and returned to work shortly thereafter.  From April 1, 2009 through June 24, 2009, plaintiff's husband was not hospitalized, returned to work, did not miss work for any extended period of time and was able to drive.  The record does not contain any competent, admissible evidence establishing that plaintiff's husband suffered from a serious health condition and therefore, no evidence that plaintiff would have qualified for protected leave under the FMLA.  "Where an employee has not shown his absences to be a result of a serious health condition, he is not protected by the FMLA." *Brehmer*, 2008 WL 3166265, at *8.

## B.    Notice

Even assuming plaintiff was entitled to take leave, plaintiff was obligated to provide her employer with notice.  Under the FMLA, employees are required to provide, whenever possible, at least thirty days' notice for leave that is foreseeable. *Brown,* 488 F.Supp.2d at 408 (citing 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302(a)).  Where the need for leave has arisen unexpectedly, 29 C.F.R. § 825.303 provides that:

(a) When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer of the need for FMLA leave as soon as practicable under the facts and circumstances of the particular case. It is expected that an employee will give notice to the employer within no more than one or two working days of learning of the need for leave, except in extraordinary circumstances where such notice is not feasible. In the case of a medical emergency requiring leave because of an employee's own serious health condition or to care for a family member with a serious health condition, written advance notice pursuant to an employer's internal rules and procedures may not be required when FMLA leave is involved.

(b) The employee should provide notice to the employer either in person or by telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice may be given by the employee's spokesperson (e.g., spouse, adult family member or other responsible party) if the employee is unable to do so personally. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee or spokesperson will be expected to provide more information when it can readily be accomplished as a practical matter, taking into consideration the exigencies of the situation.

"[T]he employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036 -1037 (8th Cir. 2010) (citations omitted). "The employee seeking FMLA leave must 'provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request' " . *Id.* (citations omitted).  An employee seeking leave need not expressly invoke the FMLA in her notification; it is sufficient that she give a basis for her leave that qualifies under the FMLA. *Brown*, 488 F.Supp.2d at 409 (citing *Slaughter v. Am. Bldg. Maint. Co. of New York,* 64 F.Supp.2d 319, 325 (S.D.N.Y. 1999) ("[i]t is not necessary for an employee to invoke the statute expressly, or to refer to the statute when communicating his or her need for leave to the employer")).   Indeed, the

FMLA places a significant burden on the employer to both make itself aware of the FMLA's dictates and to inform its employees of their rights under the FMLA. *Slaughter*, 64 F.Supp.2d at 325 (citing 29 U.S.C. § 2619; 29 C.F.R. §§ 825.300(a)).  After the employee provides the required notice, "the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying." *Id*.  "Nothing in the [FMLA] . . . places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Id*. (citing *Brohm  v. JH Prop., Inc.,* 149 F.3d 517, 523 (6th Cir. 1998)). "While an employee's statements may give rise to a duty on the part of the employer to inquire into the nature of the employee's need for leave, the employer is not required to be clairvoyant." *Id*. (citation and internal quotation marks omitted) (the plaintiff's contention that the defendant bore the burden of inquiring further if it questioned the plaintiff's need for FMLA leave, is a position that essentially "puts the cart before the horse" unless the defendant was first properly notified by the plaintiff).

Here, as noted *supra*, plaintiff did not submit any medical documentation regarding her husband's condition.  Moreover, plaintiff testified that she did not submit a request for family medical leave. *See* Pltf. Dep. at p. 88.  However, plaintiff's interference claims are premised on the argument that she did not have a duty to provide notice because defendants failed to provide her with the required FMLA paperwork.  The record and prevailing caselaw does not support plaintiff's contentions.   The February 2009 emails between Leonard and plaintiff, with attachments, establish that defendants provided plaintiff with notification of her rights under the FMLA.  Upon receiving the emails, plaintiff clearly advised Leonard that she did not intend to request FMLA leave as she responded, "I will just keep it the way I am doing it".  In April 2009,

Leonard sent plaintiff a second copy of the documents previously forwarded in February 2009 with a Certification of Health Care Provider for Family Member's Serious Health Condition. Plaintiff does not dispute that she received the documents. Rather than submit a request for FMLA leave, in early April 2009, plaintiff submitted a request for VRWS. In April 2009, during conversations with Hall and Tewksbury, plaintiff never expressed any intention to apply for FMLA leave.

Plaintiff offers no caselaw in support of her argument that any notice deficiency was due to defendants failure to provide her with the proper forms. Indeed, caselaw suggests otherwise. *See Slaughter*, 64 F.Supp.2d at 325. Plaintiff's reliance upon the Second Circuit holding in *Woodford v. Cmty Action of Greene County, Inc.*, 268 F.3d 51 (2d Cir. 2001) is misplaced. In *Woodford*, the plaintiff sought to take leave under the FMLA due to stress, anxiety and depression, arising from the alleged harassment. The defendant provided the plaintiff with an "Employer Response to Employee Request for Family or Medical Leave" form which indicated that she was an employee eligible for leave under the FMLA and indicated that the defendant had determined that she was a "key employee" and that, consequently, she would not be reinstated to her former position at the end of her leave because doing so would "cause substantial and grievous economic harm" to the defendant. Upon receiving notice that the defendant would not reinstate her, the plaintiff filed suit. The facts and issues presented to the *Woodford* Court are distinguishable from the matter at hand. In *Woodford*, plaintiff took affirmative steps and sought FMLA leave. The Second Circuit discussed 29 C.F.R. § 825.110(d) noting that the regulation, "concerns, in part, an employer's responsibility for determining an employee's eligibility for leave under the Act and for providing an employee with notice of such eligibility **where leave has been requested**." *Id*. at 56 (emphasis added). After examining relevant caselaw, the Court held that

Woodford lacked the minimum hours of employment necessary to qualify as an eligible employee under the FMLA. *Id*. at 58. In contrast, here, the parties dispute the issue of notice. More importantly, plaintiff admittedly never filed or submitted a request for FMLA leave. Accordingly, the *Woodford* holding is not controlling herein.

While plaintiff was forthcoming about deeply personal and private issues concerning her husband, the record does not support plaintiff's assertion that he suffered from a serious medical condition in such a way that would lead this Court to conclude that defendants were on notice that plaintiff intended to or needed to take FMLA leave. Indeed, courts have ruled in favor of employers finding a lack of notice in matters where the employer had significantly more information than defendants herein. *See Brown*, 488 F.Supp.2d at 490 (the plaintiff's phone calls, doctor's letter, the defendant's brief conversations with the plaintiff's sister and mother, and an additional physician's letter, taken collectively, did not constitute adequate notice under the FMLA); *see also Kobus*, 608 F.3d at 1037 (the plaintiff was made aware of the procedures necessary to obtain FMLA leave and did not pursue FMLA leave and, in fact, expressly rejected it). Based upon the facts and the statute, the Court finds that plaintiff failed to establish that she adequately notified defendants of that she was entitled to and was requesting FMLA leave.

### C.     Discouraged From Exercising Rights

Even assuming plaintiff could establish that she provided sufficient notice to defendants, plaintiff must also establish that she was denied benefits which she was entitled to under FMLA. Plaintiff claims that she was denied benefits because she was discouraged from exercising her rights under the FMLA. Specifically, plaintiff alleges that her absences were "significantly limited" due to warnings from Hall and Tewksbury that her absences "would be considered in evaluating her performance in early April 2009".

"Discouraging an employee from exercising rights protected by the FMLA can amount to a denial of benefits in violation of the FMLA upon a showing that the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Tomici v. New York City Dep't of Educ.*, 2012 WL 6608510, at *13 (E.D.N.Y. 2012) (citations and internal quotations omitted). Although the plaintiff need not give formal notice that she would be taking leave, a plaintiff must objectively assert his or her FMLA rights before she can prevail on an "interference by discouragement" theory. *See Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F.Supp.2d 423, 429 (S.D.N.Y.2007); *see also Golden v. New York City Dep't of Envtl. Protection*, 2007 WL 4258241, at *2-3 (S.D.N.Y. 2007) (the plaintiff did not request leave and thus, that the comments made by the plaintiff's supervisor did not interfere with the plaintiff's FMLA rights).

Plaintiff claims that, had she been advised that her absences were FMLA-qualified, she would not have been required to request VRWS and that she "significantly limited her absences in the wake of Hall and Tewksbury's warnings that her absences could be considered in evaluating her performance in early April 2009". Plaintiff cites to no caselaw in support of her conclusory assertions. On April 1, 2009 and April 3, 2009, plaintiff had conversations with Hall and Tewksbury regarding the Civil Service rules and the possibility that plaintiff's probation would be extended if she exceeded 40 days of leave. These conversations were memorialized and well-documented in emails and memorandum. Indeed, plaintiff concedes that after her April 3, 2009 conversation with Tewksbury, she "expressed her appreciation for the VRWS". Plaintiff's subjective interpretation of her conversations with Hall and Tewksbury are insufficient to establish that she was denied benefits due to the "discouragement theory". *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F.Supp.2d 193, 200 (S.D.N.Y. 2009) (without inquiring as to what her

supervisor "meant", the plaintiff claimed that she "understood" him to be discouraging her from seeking FMLA leave).   Moreover, plaintiff admits that during her traineeship, from May 2008 through June 24,  2009, every one of plaintiff's leave requests was granted.  *See* Def. Statement of Material Facts at ¶ 204.  Plaintiff has not produced any evidence to demonstrate that Hall's and/or Tewksbury's comments, "would have deterred an employee of ordinary firmness, in a situation similar to [hers], from requesting or taking FMLA leave."  *See Reilly v. Revlon, Inc*., 620 F.Supp.2d 524, 536 (S.D.N.Y. 2009).  Plaintiff offers nothing to suggest that the conversation was more than a warning or "generalized statement" that "discourag[ed] employee absences, undoubtedly common in almost any workplace".  *See Serby v. New York City Dep't of Educ*., 2012 WL 928194, at *7 (E.D.N.Y. 2012) (the plaintiff had not yet informed the principal of her intention to take FMLA leave when the alleged "discouragement" occurred) .

Based upon the record, defendants' motion for summary judgment and dismissal of plaintiff' FMLA interference cause of action is granted.[11]

## III.    FMLA Retaliation

In the second cause of action, plaintiff alleges that she was terminated from the traineeship program in retaliation for exercising her rights under the FMLA.  Defendants moves for summary judgment arguing that plaintiff did not engage in conduct protected under FMLA and further, that the evidence does not support a causal connection between the alleged protected conduct and adverse employment action.  Moreover, defendants contend that they had legitimate, non-retaliatory reasons for terminating plaintiff's probation.

---

[11] Defendant also argues that plaintiff cannot sustain an interference claim because she has not proven damages.  As the Court has determined that plaintiff has failed to establish a *prima facie* case for interference under the FMLA, the Court takes no position on plaintiff's alleged damages.

To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that (1) "he exercised rights protected under the FMLA," (2) "he was qualified for his position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza,* 365 F.3d at 168. The burden of production then shifts to the defendant to state a legitimate, non-discriminatory reason for the adverse employment action. *Tomici*, 2012 WL 6608510, at *15 (citing *inter alia Farias v. Instructional Sys*., 259 F.3d 91, 98 (2d Cir. 2001)). "The employer's burden is 'merely one of production, not persuasion; it can involve no credibility assessment.' " *Id.* (citations omitted). The burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for retaliation. *Id*.

Plaintiff claims that she engaged in protected activity because she was retaliated against for "attempting to utilize her rights under FMLA". Plaintiff relies upon the same arguments she asserted in support of her interference claim and asserts that while she did not file the necessary FMLA forms, that was due to defendants' failure to provide plaintiff with the necessary forms to complete.

Based upon the record, plaintiff cannot establish the first element of a *prima facie* case. The evidence establishes that Leonard and plaintiff discussed FMLA on two occasions, in February and April 2009. Plaintiff was twice provided with FMLA policy information and she was advised that she would be required to submit medical documentation. However, "[r]equesting a leave form, without more, cannot satisfy the first element." *Fischer v. NYC Dep't of Educ*., 666 F.Supp.2d 309, 318 (E.D.N.Y. 2009) (the plaintiff never actually requested leave, rather he freely and voluntarily determined not to submit the leave form because, according to him, taking leave was "just a glimpse of an idea"). Plaintiff chose to continue to charge her time

on her time sheet and then opted to apply for a Voluntary Reduction in Work Schedule (VRWS) benefits. *See Wahl v. County of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012) (the plaintiff did not exercise rights protected under the statute, despite being counseled about his rights, he chose not to because he wanted to use his accrued sick time). For the reasons set forth above, plaintiff has not established that she was eligible for FMLA benefits nor has she established that defendants were on notice of her intention to take FMLA leave. Thus, plaintiff "did not enjoy FMLA protection and did not avail herself of the rights that flow from the FMLA, a necessary element of a retaliation claim." *See Brown*, 488 F.Supp.2d at 410. Plaintiff has not established that she was entitled to FMLA leave, therefore, it was impossible for her to engage in any conduct protected under the Act. Accordingly, her claim of retaliation under the FMLA must fail as a matter of law. *See Taylor v. Georgia-Pacific LLC,* 2008 WL 906527, at *12 (W.D.Ark. 2008).

### III.    Title VII - Disparate Treatment

In his response to defendants' motion for summary judgment, plaintiff agrees to withdraw her Title VII claims based upon disparate treatment. Accordingly, defendants' motion for summary judgment and dismissal of this claim is granted.

### IV.    Hostile Work Environment

Defendants move for summary judgment on plaintiff's hostile work environment claim arguing: (1) the plaintiff has failed to set forth any disputed material facts on the basis of which a reasonable jury could conclude that she was subjected to a hostile work environment; and (2) defendants have established the elements of the *Faragher/Ellerth* affirmative defense; and 3) plaintiff failed to make any complaints of sexual harassment.

To succeed on a claim for hostile work environment under Title VII, plaintiff must establish: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer". *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (citations omitted). Plaintiff must demonstrate that the complained conduct created a hostile environment because of plaintiff's sex. *Guarino v. St. John Fisher Coll.*, 321 F. App'x 55, 57 (2d Cir. 2009). The standard for establishing a hostile work environment is high, *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir.2003), and a claim cannot be based upon vague, unsupported allegations. *Thomas v. Bergdorff Goodman, Inc*., 2004 WL 2979960, at *7 (S.D.N.Y. 2004).

Plaintiff must prove both objective and subjective elements, i.e., that the conduct alleged is so severe and pervasive as to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive. *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 22 (1993). The Supreme Court has held that a work environment's hostility should be assessed based on the "totality of the circumstances". *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir.2007) (citing *Harris*, 510 U.S. at 23). Factors to consider in assessing the totality of the circumstances include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id*. With respect to the frequency of the alleged conduct, it is not only how long the conduct lasts, but also the offensiveness of the actions that should be considered in determining whether such actions are pervasive. *Carrero v. New York City Hous. Auth*., 890 F.2d 569, 578 (2d Cir.1989). Isolated, minor episodes of harassment do not, however, merit relief. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997); *see also Ferguson v. New York City Transit Auth*., 2005 WL 3149524, at *9 (E.D.N.Y. 2005) (holding that the plaintiff's claims, which occurred three months apart, were not severe or pervasive).

A workplace may be found to be hostile on the basis of gender "where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's gender". *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir.2001); *accord Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998). Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive. *Oncale*, 523 U.S. at 81–82 (holding that Title VII does not establish a "general civility code" for the American workplace). Because a hostile work environment claim "focuses on the nature of the workplace environment as a whole," evidence of racial and sexual harassment and hostility beyond what is directed specifically at the plaintiff is relevant to the analysis. *Williams v. Consol. Edison Corp. of N. Y.*, 255 F. App'x 546, 549 (2d Cir. 2007) (citing *Cruz v. Coach Stores*, Inc., 202 F.3d 560, 570 (2d Cir.2000)). The Second Circuit has held that, "hostile work environment claims present 'mixed question [s] of law and fact' that are 'especially well-suited for jury determination'". *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir.2006) ("an Article III judge is not a hierophant of social graces and is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate and actionable sexual harassment") (quotations omitted).

A.     Was the Alleged Conduct Severe and Pervasive?

In support of the motion for summary judgment, defendants acknowledge eleven alleged instances of conduct/behavior by Hall. Defendants argue that the conduct did not create an environment that a reasonable person would find hostile or abusive and contend that some of Hall's jokes/comments are gender neutral and do not meet the requisite level of extremity and

frequency. Defendants also claim that plaintiff contributed to the environment with her non-work related, suggestive emails.

The incidents and behavior attributable to Hall and cited by defendants include: (1) a joke about a "ten inch pianist" in the Fall 2008; (2) a joke about a proctologist in April 2009; (3) the sentence in the April 2009 effective writing class manual about a secretary with large drawers and thick legs; (4) referring to plaintiff as "Vanna White" on four occasions; (5) forwarding an email in June 2008 with comments about the "new girl" having "small hands" and following with a conversation about "a hand job or something"; (6) frequently greeting plaintiff with, "Good Morning, Gorgeous"; (7) telling plaintiff, on two occasions, that her body reminds him of a parking ticket because it has "fine" written all over it; (8) asking plaintiff if she was a natural red head and indicating "there is only one way to find out"; (9) sending any email in November 2008 to plaintiff referring to "Wild Women in Peekskill" videos; (10) giving plaintiff perfume on her birthday; and (11) asking plaintiff if she has any single sisters.[12]

Upon review of the record, it is clear that the incidents complained of were not isolated or episodic. Indeed, Hall admits to most of the aforementioned conduct and some of the remarks/jokes/comments occurred more than once between June 2008 and April 2009. While defendants argue that the majority of incidents are facially neutral, these occurrences may be included "among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as the reasonable fact-finder could conclude that they were, in fact, based on sex." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). If other evidence could indicate to a jury that a sex-neutral incident was, in fact, sex based, the sex-neutral incident cannot be ruled out as a component of the alleged harassment. *Schmidt v. State Univ. of New York*

---

[12] Hall denies asking plaintiff if she was a natural red head and denies asking plaintiff if she had single sisters.

*at Stonybrook*, 2006 WL 1307925, at *9 (E.D.N.Y.2006). Here, the Court must determine whether there is circumstantial evidence or some other basis from which a jury could rationally infer these alleged incidents were based on plaintiff's gender. *McCowan v. HSBC Bank USA, N.A.,* 689 F.Supp.2d 390, 417 (E.D.N.Y. 2010). Having carefully reviewed the record in the light most favorable to plaintiff, when the facially neutral incidents are combined with the other jokes and comments, a rational jury could conclude that the conduct was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. The record contains ample evidence of alleged sexually based harassment that could allow a jury to conclude that Hall's jokes and comments, while possibly sexually neutral, were, in fact, sex-based.

Defendants argue that plaintiff's actions demonstrate that she did not, subjectively, perceive Hall's conduct as hostile. Defendants reference plaintiff's non-work related, "suggestive" emails. Evidence that a plaintiff has engaged in behavior that runs contrary to his or her assertions that the work environment was hostile thus may be considered. *See Reed v. Shepard*, 939 F.2d 484, 486-487 (7th Cir.1991) (noting that plaintiff's "welcome of sexual hijinx" was fatal to her sexual harassment claim under Title VII). However, the ultimate resolution of the issue of whether "[w]hether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder." *El-Bakly v. Autozone, Inc.*, 2008 WL 1774962, at *14 (N.D. Ill. 2008) (citing *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004)).

Taking all of the comments and incidents as a whole, there is a genuine issue as to whether plaintiff suffered from a hostile work environment. *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 103 (2d Cir. 2010) (the quantity of comments, touching and other conduct,

when taken together, described a work environment that a jury could find inappropriate).

Accordingly, plaintiff's claim survives summary judgment. Thus, the dispositive issue is whether there is a basis to impute Hall's conduct to defendants.

### B.    Imputing Conduct to Employer

In addition to establishing that she was subjected to a hostile employment environment, plaintiff must establish that the conduct which created the hostile situation should be imputed to the employer. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir.1992). When the alleged harasser has a supervisory position over the plaintiff, his conduct is automatically imputed to the employer, subject to proof by a preponderance of the evidence, to raise an affirmative defense that examines the reasonableness of the conduct of the employer and victim/employee. *Gorzynski*, 596 F.3d at 103; *see also Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir.2001) (*citing Faragher v. City of Boca Raton*, 524 U.S. 742, 765 (1998)) "Against employee claims of hostile work environment [ ], the employer may have recourse [with] the [ ] *Faragher/Ellerth* affirmative defense." *Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006) (citations omitted). However, the affirmative defense is only available when the employer does not take any tangible employment action against the plaintiff. *Leopold*, 239 F.3d at 245. If a supervisor's behavior is illegal under Title VII and culminates in a tangible employment action against the employee, the employer will be vicariously liable for it. *Mack v. Otis Elevator, Co.*, 326 F.3d 116, 124 (2d Cir. 2003) (citations omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 124 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). As a general rule, a tangible employment action will typically occur in cases where the supervisor,

"acting with the authority of the company," makes an employment decision that "inflicts direct economic harm" on the employee. *Cady v. Cortland*, 2000 WL 1456285, at * 13 (N.D.N.Y. 2000); *see also Gibson v. Crucible Materials Corp*., 290 F.Supp.2d 292, 299 (N.D.N.Y. 2003) (the plaintiff provided no evidence that she suffered any "direct economic harm" or that her responsibilities changed so as to constitute a tangible employment action). A "tangible employment action" requires an act which the employer ratified or approved. *Finnerty v. William H. Sadler, Inc.,* 176 F. App'x 158, 161 (2d Cir.2006). In order to avoid an employer's assertion of Faragher/Ellerth on this basis, however, there must be a nexus between the employment action and the harassing conduct at issue. *Edrisse v. Marriott Int'l Inc*., 757 F.Supp.2d 381, 388 (S.D.N.Y.2010) ("[t]his is so because harassment typically falls outside the scope of a supervisor's duty, negating vicarious liability, but when the harassment includes or results in a tangible employment action, the employer as a legal matter has taken part in the harassing conduct"); see also *Ferraro,* 440 F.3d at 102. "It is not enough that the supervisor who created the alleged hostile work environment played a role in the employment action." *Id.* ("that the supervisor's remarks are evidence of bigotry, which may have driven or factored into plaintiff's discipline and may well support a claim of discrimination against Marriott, Marriott cannot be said to have participated in the harassing conduct by taking action against plaintiff unrelated to that conduct").

Here, defendants do not dispute that Hall was plaintiff's supervisor but argue that the termination of plaintiff's probation was not connected to any alleged sexual harassment and thus, was not a tangible employment action prohibiting defendants from raising the *Faragher/Ellerth* defense. Plaintiff does not set forth a cogent argument in opposition and states, in conclusory fashion, that Hall's recommendation to terminate her employment established the necessary

tangible action to impute liability to defendants.  While the termination of plaintiff's probation could be considered tangible employment actions, as will be further discussed infra, defendants have set forth sufficient evidence to establish that the action was taken because plaintiff was insubordinate and thus, the action was independent of Hall's alleged harassment.  The Court finds that plaintiff has not produced sufficient prove to establish, as a matter of law, that there was a nexus between the termination of plaintiff's probation and the alleged sexual harassment sufficient to preclude defendants from raising the *Faragher/Ellerth* affirmative defense.

### C.    Faragher/Ellerth Defense [13]

The *Faragher/Ellerth* affirmative defense consists of two elements: (1) "the employer exercised reasonable care to prevent and correct promptly any harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. The Second Circuit has held that because the employer bears the burden of proving the *Faragher/Ellerth* defense, summary judgment on this issue is cautioned against unless, "the evidence is so overwhelming that the jury could rationally reach no other result." *Prince v. Madison Square Garden,* 427 F.Supp.2d 372, 382 (S.D.N.Y.2006) (citing *Fairbrother v. Morrison*, 412 F.3d 39, 53 (2d Cir.2005)).

The employer need not prove success in preventing the behavior in order to establish that it took reasonable steps to prevent and correct the conduct. *Leopold*, 239 F.3d at 245.  Although it is not dispositive, one way an employer may demonstrate that they exercised reasonable care is to

---

[13] In the Answer, defendants assert that the complaint is barred because, "the Division provided a reasonable avenue for complaint and exercised reasonable care to prevent and promptly correct any harassing or discriminatory behavior and the plaintiff failed to take advantage of the preventative or corrective opportunities provided by the Division or to avoid harm otherwise". *See* Def. Answer to Pl's. Cmplt, ¶ 17.

show that an anti-harassment policy was in place. *Mack*, 326 F.3d at 128. Before an employer can reasonably respond to sexual harassment, it must have adequate notice of the harassment. *See Fierro v. Saks Fifth Ave.*, 13 F.Supp.2d 481, 492 (S.D.N.Y. 1998). "Generalities are not enough to put an employer on notice". *Schmidt*, 2006 WL 1307925, at *13 (the court found that the plaintiff's general comments that she was "uncomfortable" and felt that the defendant was "overbearing" fell short of establishing constructive notice of harassment) (citing *Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243 (2d Cir.1995)).

If the employer has demonstrated that the plaintiff failed to avail herself of the complaint procedure, the burden of proof shifts to the employee to come forward with an explanation why she did not make use of the procedures. *See Bennett v. Progressive Corp.*, 225 F.Supp.2d 190, 208 (N.D.N.Y. 2002). "Determining whether a plaintiff has unreasonably failed to take advantage of the options provided in an employer's sexual harassment policy depends on the facts and circumstances of a given case and can, raise a question for the jury." *Gorzynski*, 596 F.3d at 105.

### 1.      First Prong

Here, the record establishes that defendants had a sexual harassment policy in place at the time of the alleged harassment that strictly prohibits discrimination against individuals on the basis of sex. Plaintiff does not present any argument with respect to the reasonableness of the policy or the procedures set forth therein. Therefore, the Court finds that defendants have satisfied the first element of the *Faragher/Ellerth* affirmative defense. *See Ferraro,* 440 F.3d at 102.

### 2.      Second Prong

Plaintiff claims that she took advantage of the remedial measures set forth in the sexual harassment policy and cites to the following events: (1) plaintiff's March meeting with Corbitt; (2) plaintiff's April 2009 email correspondence to Hall; and (3) plaintiff's April 2009 written response to her third performance evaluation. Plaintiff argues that based upon the aforementioned, "it is disingenuous to argue that defendants exercised reasonable care to prevent and correct the behavior or that plaintiff failed to take advantage of opportunities to avoid the harm". Defendants argue that none of the aforementioned can be construed to constitute a complaint of sexual harassment because plaintiff simply recounted Hall's behavior but never specifically complained that she was suffering from sexual harassment.

With respect to the March 2009 meeting with Corbitt, there is conflicting testimony regarding the sum and substance of plaintiff's meeting with Corbitt. Specifically, plaintiff testified that during the March 18, 2009 meeting, she told Corbitt that Roger was "constantly telling dirty jokes in classes, and I said I'm not happy with it because it's humiliating me as a trainee." *See* Pltf. Dep. at p. 108. Plaintiff continued:

> Q.    So it's your testimony that during your meeting with Ms. Corbitt on or about March 18, 2009, you specifically mentioned what you believed to be inappropriate comments by Roger Hall?
>
> A.    Yes.

*Id.* at p. 109.

Defendants claim that plaintiff's deposition testimony is contradicted by her written summary of the meeting that plaintiff submitted to the NYS Division of Human Rights. During plaintiff's deposition, defense counsel presented this statement:

> Q.    And you indicated, "My key points with Ms. Corbitt were, not getting offered the training unless Larry Stoffa couldn't do it or didn't want it. Then Steve came into play and was being

offered it before me, also. He was only a 20 percent item in our unit. I was 100 percent. I would have appreciated more opportunity. I deserved it. I was mandated to take state vehicles. They were not. No cell phone for travel. I got an email on 4/3 there was a cell phone waiting for me. No business cards, never got. Why would they order them now when they were planning on firing me? She requested me to email her a brief summary of the training and the names and who did them. I emailed her a short email."

Was this your summary of this meeting with Earline Corbitt on March 18, 2009, or thereabouts, in your rebuttal for the Division of Human Rights?

*       *       *

A.       It was part of it, yeah.

Q.       You didn't mention in there about telling Earline about Roger Hall's allegedly inappropriate comments; would you agree with me on that?

A.       Well, I mentioned that in other parts of this.

*       *       *

Q.       It says "March 18, 2009 conversation with Diversity Earline Corbitt. My key points were . . ."

A.       Key points.

Q.       So we would agree you didn't mention Roger Hall's allegedly inappropriate remarks under those key points?

A.       Absolutely no. That's false. I did mention it.

Q.       I'm talking about in the rebuttal.

A.       Not in my rebuttal, no, not in that paragraph.

*Id.* at 117-119.

Corbitt asserts that plaintiff never made any statement to her regarding any inappropriate comments or behavior by Hall nor did she complain that she was being discriminated against based upon her gender. *See* Corbitt Dec. at ¶ 8-9.

Having reviewed the record, a reasonable fact finder may conclude that plaintiff's complaints could be construed as complaints of sexual harassment. Plaintiff complained to Corbitt, whose title was "Director of the New York State Division of Parole's Office of Equal Employment Opportunity ("EEO")/Diversity Management (Affirmative Action). Corbitt states that she was responsible for "investigating discrimination and sexual harassment complaints by Division employees and conducting in-service training on preventing sexual harassment'. Defendants' Employee Manual is annexed as an exhibit to the within motion. Defendants do not cite to any provision of their anti-harassment policy instructing employees who, when or how they should complain of sexual harassment. The policy refers to the Equal Employment Opportunity Commission and states that, "[s]wift, thorough and confidential investigations will be conducted and administrative measures, including disciplinary actions will be taken if allegations of sexual harassment are established". There are genuine issues of fact as to whether plaintiff complained to Corbitt in accordance with defendants' anti-discrimination policy, and whether Corbitt failed take action against them as required by that policy. *See Millin v. McClier Corp.*, 2005 WL 351100, at *8 (S.D.N.Y. 2005).

Moreover, the conflicting testimony requires the Court to assess the credibility of witnesses which the Court is precluded from doing on a motion for summary judgment. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) (citation omitted). These determinations are within the sole province of the jury. *See Pugni v. Reader's Digest Ass'n, Inc.*, 2007 WL 1087183, at *17 (S.D.N.Y. 2007) (the defendant denied that the plaintiff ever

complained of conduct to him, and a reasonable jury could certainly believe him, but credibility determinations are not appropriate at the summary judgment stage); *see also Barrows v. Seneca Foods Corp.,* 2013 WL 656742, at *4 (2d Cir. 2013) (there are material questions of fact concerning whether the plaintiff failed to take advantage of the defendant's complaint procedure because the plaintiff testified that, as required by the defendant's anti-harassment policy, he complained to his supervisors about the defendant's conduct on multiple occasions). In *Barrows*, the Second Circuit acknowledged that, "[a]lthough many of his supervisors deny ever receiving such complaints from [the plaintiff] . . . [t]he actual content of th[e] conversation and the veracity of [the plaintiff's] contention that he had similar conversations with other supervisors are disputed issues of fact that we must leave for the jury."

Viewing the evidence in a light most favorable to plaintiff, the Court finds that defendants have failed to establish, with competent, admissible evidence, the second prong of the *Faragher/Ellerth* analysis, i.e., that plaintiff failed to avail herself of the remedial measures provided in defendants' anti-harassment policy. While summary judgment and dismissal of the hostile work environment claim is not warranted, defendants are permitted to raise the *Faragher/Ellerth* affirmative defense.

## V.    **Title VII - Retaliation**

Title VII forbids an employer from retaliating against an employee for complaining of employment discrimination:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice, made an unlawful employment practice by this subchapter, or, because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

In order to establish a *prima facie* case of retaliation, a plaintiff must present evidence that would permit a rational trier of fact to find that: (1) she engaged in protected participation or opposition under Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205–206 (2d Cir. 2006) (internal citations omitted). In this context, an adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Ibok v. Secs. Indus. Automation Corp.*, 369 F. App'x 210, 213 (2d Cir. 2010) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). Adverse employment actions are not defined "solely in terms of job termination or reduced wages and benefits, . . . less flagrant reprisals by employers may indeed be adverse." *Alston v. New York City Transit Auth.*, 14 F.Supp.2d 308, 311 (S.D.N.Y.1998) (citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (adverse employment actions are not defined at all, but are left to the court's discretion to make determinations on a case by case basis)). In a retaliation claim, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (2006) (internal quotation marks omitted). With respect to the third prong, in *Burlington*, the Supreme Court held that Title VII's substantive provisions and its anti-retaliation provision are not "coterminous". Rather, the Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means that it might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id*. at 68. Title VII's core

42

anti-discriminatory provisions are narrower than Title VII's retaliation provisions and what might not qualify as an adverse employment action under Title VII's anti-discrimination provisions may still violate Title VII's anti-retaliation provisions. *Id*. Retaliation can be actionable even when the alleged adverse action "had not effected any change in [the employee's] salary, benefits, job, title, grade or hours. *Kessler*, 461 F.3d at 201. Any reasonable employee that believed that her employers would engage in a concerted effort to drive her from her job if she engaged in Title VII protected activity would think twice about doing so. *Patane*, 508 F.3d at 116. Although the Court "loosened the standard previously applied in retaliation claims", the White standard is still a rigorous one. *Dixon v. City of New York*, 2008 WL 4453201, at *11 (E.D.N.Y. 2008).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). In assessing this phase of the burden-shifting analysis, the Court may not conduct a credibility assessment. *Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010). If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational fact finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See id.* The plaintiff, at all times, bears the burden of persuasion. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033 (2d Cir. 1993). In order to defeat a motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether the employer's reasons for the action is false and unworthy of belief and, more likely than not, the plaintiff's complaint was the real reason for the action. *Woroski v. Nashua Corp.*, 31 F.3d 105, 108–09 (2d Cir.1994).

A.      **Protected Activity**

Plaintiff claims that she engaged in protected activity on three occasions: (1) when she complained about sexual harassment during her March 18, 2009 meeting with Corbitt; (2) in her April 23, 2009 email to Hall; and (3) in her April 29, 2009 written comments in response to her third performance evaluation. Defendants argue that plaintiff's complaints to Corbitt are insufficient to constitute "protected activity" for the purposes of a retaliation claim because plaintiff complaints to Corbitt involved disparate treatment, a claim she has since withdrawn.

To be protected activity, "the plaintiff need not establish that the conduct [ ]he opposed was actually a violation of Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998). "The law protects employees [who] ... make[ ] informal protests of discrimination, including making complaints to management, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory*, 243 F.3d at 700–01 (internal citations and quotation marks omitted). The reasonableness of plaintiff's belief that the underlying employment practice was unlawful "is to be assessed in light of the totality of the circumstances." *Galdieri-Ambrosini*, 136 F.3d at 292. "[I]implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.* Mere complaints of "unfair treatment by an individual" are not protected speech under Title VII. *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, 2012 WL 4483046, at *16 (E.D.N.Y. 2012) (citation omitted). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Id.* (citation omitted). However, "[a]n employee is not required to use legal terms or buzzwords when opposing discrimination." *Kelley v. Sun Microsystems, Inc.*, 520 F.Supp.2d 388, 403 (D.Conn. 2007).

As noted in Part IV(B)(2), the parties present conflicting accounts with respect to what was discussed during the meeting between Corbitt and plaintiff.  While Corbitt contends that the conversation focused on disparate treatment, plaintiff claims that she also mentioned Hall's inappropriate jokes.  Accordingly, the Court finds that there is an issue of fact with respect to whether plaintiff engaged in protected activity when she met with Corbitt in March 2009.

Defendants' contention that Hall, Tewksbury and Burgos were unaware of plaintiff's March 18, 2009 meeting with Corbitt, lacks merit.  The second element of a *prima facie* case of retaliation, the defendant's knowledge of plaintiff's engagement in protected activity, is satisfied if the plaintiff proves that the corporate entity, the employer, had knowledge that the plaintiff engaged in a protected activity. *See Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010) (this prong does not require the plaintiff to demonstrate that individuals who took the adverse employment action had knowledge of the plaintiff's protected actions).  Here, plaintiff complained to Corbitt, who admits that it was her responsibility to investigate harassment and discrimination.  Thus, a reasonable juror could conclude that Hall, Tewksbury and Burgos were on notice of plaintiff's protected activity.  *See Patane*, 508 F.3d at 116.

Even assuming plaintiff's March 2009 meeting with Corbitt did not constitute protected activity, a reasonable juror could conclude that plaintiff engaged in protected activity on April 23, 2009 when she emailed Hall regarding his behavior.  Plaintiffs complaints to Hall were sufficiently specific to put defendants on notice that plaintiff believed she was being discriminated against on the basis of gender.

### B.     Adverse Action/Causation

Plaintiff argues that when she was terminated from her traineeship, she suffered a reduction in her title, salary and benefits.  Defendants do not dispute that the termination was an

adverse action and have submitted no evidence to contradict plaintiff's assertions. Rather, defendants argue that there is no causal connection between this action and plaintiff's March 18, 2009 meeting with Corbitt because Hall, Burgos and Tewksbury were unaware of the conversation at the time they decided to terminate plaintiff's probation.[14]

As noted *supra*, there are issues of fact which preclude this Court from ruling, as a matter of law, that defendants had no knowledge of plaintiff's March 18, 2009 meeting with Corbitt. The Second Circuit has held a causal connection can be established by showing temporal proximity between the protected activity and the adverse action. *See Manoharan v. Columbia Univ*., 842 F.2d 590, 593 (2d Cir. 1988). Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment, through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant". *De Cintio v. Westchester County Med. Ctr*., 821 F.2d 111, 115 (2d Cir.1987). Plaintiffs who resort solely to temporal proximity in proving causation must demonstrate the existence of a time frame that is "very close". *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). There is no "bright line" to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship. *Id.*

Here, the alleged retaliatory action occurred approximately three or four months after plaintiff's protected activity. Courts have found this length of time sufficient to support a causal connection. *Hubbard v. Total Commc'n, Inc.*, 347 F. App'x 379, 681 (2d Cir. 2009) (finding that four months between protected activity and adverse employment action did not exceed the "outer limit" of when causation may be inferred from temporal proximity); *see also Gorman–Bakos v.*

---

[14] Defendants offer no caselaw in support of this contention.

*Cornell Coop. Ext.*, 252 F.3d 545, 555 (2d Cir. 2001) (finding four to five months between protected activity and adverse employment action sufficient temporal proximity to establish causation). In addition to the close temporal proximity, plaintiff presents circumstantial evidence to support causation. The evidence demonstrates that four days after plaintiff's April 23, 2009 email to Hall, plaintiff's third performance evaluation contained negative statements regarding plaintiff's relationship with Hall. The statements in this evaluation are critical in nature and differ from comments in the two prior evaluations. Specifically, in the prior evaluations, plaintiff's supervisors noted that she communicated well with her supervisors. Conversely, in the April 2009 evaluation, plaintiff's supervisors were concerned with her inability to communicate with Hall. *See Casalino v. New York State Catholic Health Plan, Inc.*, 2012 WL 1079943, at *15 (S.D.N.Y. 2012) (the plaintiff's negative evaluation came less than a month after her complaint regarding the defendant and differed substantially from her prior performance review which was generally positive).

Viewing the evidence in a light most favorable to plaintiff, the Court finds that plaintiff has established a *prima facie* case for Title VII retaliation sufficient to survive defendants' motion for summary judgment.

## C.    Legitimate, Non-Retaliatory Reasons

Defendants claim that plaintiff was terminated because she was insubordinate and disrespectful towards Hall and Tewksbury on June 10, 2009 and June 11, 2009. Courts have routinely held that a defendants' decision to terminate a plaintiff for insubordination is legitimate, non-retaliatory explanation. *See Hines v. City of New York*, 159 F.3d 1346, at *2 (2d Cir. 1998); *Amin v. Akzo Nobel Chem., Inc.*, 282 F. App'x 958, 962 (2d Cir. 2008) (the defendant proffered legitimate, non-retaliatory reasons for discharging the plaintiff, to wit, that the plaintiff had a

history of insubordinate behavior and difficulty in working effectively with others); *see also Dorcely v. Wyandanch Union Free Sch. Dist*., 665 F.Supp.2d 178, 217 (E.D.N.Y. 2009) (the plaintiff's lack of professionalism and insubordination constituted a legitimate non-retaliatory reason for adverse employment action). Thus, the burden shifts to plaintiff to establish that defendants' explanation is pretext for retaliation.

**D.    Pretext**

The Court considers whether plaintiff has adduced evidence that would permit a rational factfinder to conclude that defendants' explanation for the termination of plaintiff's probation is a pretext and that the real reason was retaliation for plaintiff's prior complaint. Plaintiff argues that, she was never disciplined for insubordination during her 18 year career with defendants. Moreover, plaintiff cites to Burgos' deposition testimony and his assertion that it was "rare" for a probationary employee to be terminated. From the record, a reasonable jury could find that insubordination was not the true reason for the termination of plaintiff's traineeship. Plaintiff has produced sufficient evidence for a reasonable jury to conclude that defendants' stated reason for her termination was a pretext for unlawful retaliation. *See e.g., Peterson v. City of Rochester*, 2010 WL 1408013, at *10 (W.D.N.Y. 2010) (the plaintiff's prior reviews noted that the plaintiff was "an above average employee").

The record presents genuine issues of fact with respect to the issue of retaliation as a reasonable jury could find that defendants' decisions to discipline and terminate plaintiff were motivated, at least in part, by retaliatory animus. *See Williams v. City of New York*, 2006 WL 2668211, at *22 (E.D.N.Y. 2006). Therefore, defendants' motion for summary judgment and dismissal of plaintiff's claim of retaliation is denied.

**CONCLUSION**

**IT IS HEREBY**

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 31) is **GRANTED IN PART AND DENIED IN PART**; it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's first cause of action for FMLA interference is **GRANTED**; it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's second cause of action for FMLA retaliation is **GRANTED**; it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's third cause of action for disparate treatment in violation of Title VII is **GRANTED**; it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's fourth cause of action for a hostile work environment in violation of Title VII is **DENIED**; it is further

**ORDERED**, that defendants' motion for summary judgment and dismissal of plaintiff's fifth cause of action for retaliation in violation of Title VII is **DENIED**; it is further

**ORDERED** that a Settlement Conference is scheduled in this matter for Wednesday, June 26, 2013 at 10:00 a.m. in Albany. The parties are directed to appear at that time and make submissions in advance of the conference as directed in this Court's Order Setting Settlement Conference which will be forthcoming.

**IT IS SO ORDERED.**

Dated:  May 30, 2013
        Albany, New York

Mae A. D'Agostino
U.S. District Judge